[No. S145087. May 4, 2009.]

SENTRY SELECT INSURANCE COMPANY, Plaintiff and Petitioner, v. FIDELITY & GUARANTY INSURANCE COMPANY, Defendant and Respondent.

## Counsel

Higgs, Fletcher & Mack, John M. Morris; Schindel, Farman, Lipsius, Gardner & Rabinovich and Laurence J. Rabinovich for Plaintiff and Petitioner.

Harrington, Foxx, Dubrow & Canter, Mark W. Flory and Michael C. Denlinger for Defendant and Respondent.

## Opinion

**BAXTER, J.**—Pursuant to rule 8.548 of the California Rules of Court, we granted the request of the United States Court of Appeals for the Ninth Circuit to address the following question: What is the appropriate test for determining whether an insured is "engaged in the business of renting or leasing motor vehicles without operators" under Insurance Code, section 11580.9, subdivision (b)?[1]

Under the version of Insurance Code section 11580.9, subdivision (b) (former subdivision (b))[2] controlling in this case, if a leased commercial vehicle is involved in an accident with one or more other vehicles, and its owner, the insured, is "engaged in the business of renting or leasing motor vehicles without operators," then the insured's policy is conclusively presumed to be excess to any other insurance covering the loss. The rule is part of a statutory scheme intended to establish workable, bright-line rules for allocating loss among coinsurers in the context of liability policies covering multiple-vehicle accidents. The public policy behind section 11580.9 is to avoid conflicts, litigation, and resulting court congestion in the determination of which liability policies covering multiple vehicles in an accident will provide primary, excess, or sole coverage for the resulting personal injury and property damage. (§ 11580.8.) It has further been observed, "The purpose in shifting the risk of damage from the owner's policy to the commercial lessee's policy recognizes the commercial reality that the profitmaking lessee

---

[1] Citations to five appellate court decisions that have construed the statutory language in question were included in the Ninth Circuit's order: *Travelers Indemnity Co. v. Maryland Casualty Co.* (1996) 41 Cal.App.4th 1538, 1546–1547 [49 Cal.Rptr.2d 271]; *Western Carriers Ins. Exchange v. Pacific Ins. Co.* (1989) 211 Cal.App.3d 112, 116–117 [259 Cal.Rptr. 36]; *Mission Ins. Co. v. Hartford Accident & Indemnity Co.* (1984) 160 Cal.App.3d 97, 101 [206 Cal.Rptr. 383]; *McCall v. Great American Ins. Co.* (1981) 119 Cal.App.3d 993, 998 [174 Cal.Rptr. 399]; and *Transport Indemnity Co. v. Alo* (1981) 118 Cal.App.3d 143, 148 [172 Cal.Rptr. 394].

[2] All further statutory references are to the Insurance Code.

would be better able to absorb the expense of the policy as a cost of doing business." (*Mission Ins. Co. v. Hartford Accident & Indemnity Co., supra*, 160 Cal.App.3d at p. 102.)

Two of the appellate court decisions cited in the Ninth Circuit's order—*Travelers Indemnity Co. v. Maryland Casualty Co., supra*, 41 Cal.App.4th 1538 (*Travelers*), and *McCall v. Great American Ins. Co., supra*, 119 Cal.App.3d 993 (*McCall*)—hold that courts should look to the nature of the insured's primary business in determining whether the insured is "engaged in the business of renting or leasing motor vehicles without operators" within the meaning of former subdivision (b). The other three decisions—*Western Carriers Ins. Exchange v. Pacific Ins. Co., supra*, 211 Cal.App.3d 112, *Mission Ins. Co. v. Hartford Accident & Indemnity Co., supra*, 160 Cal.App.3d 97, and *Transport Indemnity Co. v. Alo, supra*, 118 Cal.App.3d 143—suggest the focus should be on the factual circumstances surrounding the lease of the particular commercial vehicle involved in the accident when making that determination. This court to date has not rendered a decision interpreting the disputed former statutory language.

In August 2006, one month after the Ninth Circuit requested this court to clarify the test for determining whether an insured is "engaged in the business of renting or leasing motor vehicles without operators" under former subdivision (b), the Legislature amended the statute, deleting the language with which we are here concerned and replacing it with the phrase "who in the course of his or her business rents or leases motor vehicles without operators." (§ 11580.9, subd. (b), as amended by Stats. 2006, ch. 345, § 1.) This amendment of the statutory language eliminates any ambiguity as to whether the leasing of commercial vehicles must be "a regular part of the insured's business" (*Travelers, supra*, 41 Cal.App.4th at p. 1546) in order for the conclusive presumption to apply under the amended language. Section 11580.9, subdivision (b) now clearly provides that the renting or leasing of commercial vehicles without operators in the course of *any business* can qualify for the conclusive presumption that the insured's coverage is excess, where all the statutory requirements are otherwise met.

As a result of the Legislature's amendment in 2006 of the very language in former subdivision (b) that the Ninth Circuit has asked us to construe, our interpretation of the deleted language would be of limited precedential value. Nor is a definitive construction of the former statutory language necessary to resolve this matter. The insured lessor below, John's Trucking, Inc. (JTI), routinely leased nearly three-quarters of its commercial fleet of trailers to

independent truckers with whom it contracted for hauling jobs. The lease in question was a business transaction through which JTI received compensation for the lease of two trailers to the lessee, independent trucker Richard Justice (Justice), who in turn made a profit from their use. Such leasing activity cannot within reason be viewed as "merely incidental" to JTI's hauling business. (*Travelers, supra*, 41 Cal.App.4th at p. 1547.) We conclude that JTI's leasing of the commercial trailers in question plainly qualified under former subdivision (b) for the conclusive presumption that its policy was excess to other insurance covering the loss.

### FACTUAL AND PROCEDURAL BACKGROUND

In May 1999, Justice, an independent trucker, was involved in a collision in the City of San Diego with a vehicle driven by April Russo, in which her mother, Patricia Nila, was a passenger. Justice was driving his Peterbilt tractor while pulling two semitrailers owned by the insured, JTI, pursuant to a subhaul agreement. Russo and Nila brought personal injury actions against Justice and JTI. JTI successfully moved for summary judgment. The John Deere Insurance Company (John Deere), which insured Justice and was an undisputed primary insurer, eventually settled the personal injury actions on his behalf for $600,000, which was less than the policy limits. Thereafter, Sentry Select Insurance Company (Sentry) became John Deere's successor in interest, and was assigned any rights or claims that might be due and owing to John Deere from JTI's insurer, Fidelity & Guaranty Insurance Company (Fidelity), in connection with the litigation. Sentry then brought this diversity action against Fidelity in the United States District Court for the Southern District of California, alleging causes of action for contribution, implied equitable indemnity, and implied contractual indemnity.

Sentry's claims turn on the question whether the insured JTI's lease of the two semitrailers to Justice is a lease of qualifying commercial vehicles within the meaning of former subdivision (b), which in turn depends on whether JTI was "engaged in the business of renting or leasing motor vehicles without operators," the statutory language in effect at that time. If former subdivision (b) is found applicable to JTI's business and lease of the two semitrailers to Justice, any coverage for the loss afforded through JTI's Fidelity policy would conclusively be presumed excess to any coverage afforded under the John Deere policy insuring Justice's tractor. Since John Deere settled the third party claims against Justice for less than its policy limits, no contribu-

tion or indemnity would be owed by Fidelity to Sentry (as John Deere's successor in interest) if the statutory presumption applies.

### JTI's Business and Insurance Coverage

JTI is a carrier company that usually performs its hauling contracts by subcontracting with independent truckers, although it owns a fleet of tractors and trailers. In 1999, the year of the accident in question, JTI owned 12 tractors, sometimes commonly referred to as "power units," and 80 trailers, sometimes referred to as "semitrailers" when doubled up for towing behind a power unit. Each tractor is designed to pull two trailers. Accordingly, JTI utilized up to 12 tractors and 24 paired trailers, employing its own drivers for those rigs. It routinely leased the remaining 56 trailers to independent contractors pursuant to a standard trailer lease agreement, such as the one executed by Justice and JTI below. During 1999, JTI had approximately 70 active subhaul agreements with various independent contractors it used on a regular basis. Under those agreements, the independent contractors received 95 percent of the fee JTI charged its customers for jobs undertaken if using their own trailers, but only 75 percent if they leased trailers from JTI. Put differently, JTI charged the independent truckers 20 percent percent of the fee earned on a hauling job for the lease of its trailers. JTI's gross income from trailer rentals to independent contractors during the year in question was nearly $650,000. JTI did not lease its trailers to the general public.

Fidelity insured JTI under a comprehensive general liability policy that specifically described and rated the two trailers owned by JTI and leased to Justice as "covered" vehicles. Justice was not named as an additional insured, nor was his self-owned Peterbilt tractor mentioned or rated under JTI's policy. The policy also contained an "other insurance" clause, which provided that "while a covered 'auto' which is a 'trailer' is connected to another vehicle, the liability coverage this Coverage Form provides for the 'trailer' is: . . . [¶] (1) Excess while it is connected to a motor vehicle you [i.e., JTI] do not own. . . . (2) Primary while it is connected to a covered 'auto' you own."

### Justice's Business and Insurance Coverage

Justice is an independent contractor subhauler who regularly subcontracted with JTI for hauling jobs at the time of the accident. He owned his own tractor but no trailers, and routinely leased two semitrailers from JTI to perform jobs under their subhaul agreement. That subhaul agreement provided,

in part, that "Carrier [JTI] shall have no control over the persons or operations of equipment used or employed by Subhauler [Justice] in providing services under the Agreement." The trailer lease agreement executed with JTI under which Justice was also operating provided, in part, that "During the term of this Trailer Lease Agreement lessee [Justice] shall have sole possession, custody and control of the trailing equipment at all times." Pursuant to that lease agreement, JTI furnished Justice with the two 1979 Fruehauf semitrailers, license Nos. 1UA6363 and 1UA6364, which he used almost exclusively to perform jobs for JTI under the subhaul agreement, with the exception of five or six days when those trailers were being serviced and different ones were provided by JTI. The record further reflects that Justice's trucking business was separate and distinct from JTI's operations, that he was not an employee of JTI, that he operated under his own motor carrier license, and that he independently realized a profit from his business.

John Deere insured Justice under a comprehensive general liability policy with a $750,000 limit and effective dates covering the period of the underlying accident. The policy specifically described and rated Justice's 1987 Peterbilt tractor in its "Schedule of Covered Autos." Pursuant to an endorsement, JTI was also named as an additional insured. The two Fruehauf semitrailers owned by JTI and leased to Justice were neither mentioned nor rated under Justice's policy. Sentry later became John Deere's successor in interest.

### The District Court's Holding

As noted, under former subdivision (b), if a leased commercial vehicle is involved in an accident with one or more vehicles, and the insured owner of that vehicle is "engaged in the business of renting or leasing motor vehicles without operators," the insured's policy is conclusively presumed to be excess to any other insurance covering the loss. The district court acknowledged the two semitrailers leased to Justice by JTI qualified as "commercial vehicles" under former subdivision (b), but nonetheless concluded JTI was not "engaged in the business of renting or leasing motor vehicles without operators" within the meaning of former subdivision (b), and on that basis ruled that the statute's conclusive presumption did not apply to make Fidelity's coverage for JTI "excess" to the coverage under Justice's John Deere/Sentry policy, which named JTI as an additional insured.[3]

---

[3] The district court went on to grant Sentry's summary judgment motion, ruling that because former subdivision (b) did not apply on these facts, a different provision, section 11580.9, subdivision (d), controlled, making both policies primary and requiring both insurers to share the loss.

JTI's insurer Fidelity appealed. The Ninth Circuit thereafter issued its order requesting this court to answer the question of statutory interpretation regarding the language of former subdivision (b).

### DISCUSSION

Former subdivision (b) provided: "(b) Where two or more policies apply to the same loss, and one policy affords coverage to a named insured *engaged in the business of renting or leasing motor vehicles without operators*, it shall be conclusively presumed that the insurance afforded by that policy to a person other than the named insured or his or her agent or employee, shall be excess over and not concurrent with, any other valid and collectible insurance applicable to the same loss covering the person as a named insured or as an additional insured under a policy with limits at least equal to the financial responsibility requirements specified in Section 16056 of the Vehicle Code. The presumption provided by this subdivision shall apply only if, at the time of the loss, the involved motor vehicle either: [¶] (1) Qualifies as a 'commercial vehicle.' For purposes of this subdivision, 'commercial vehicle' means a type of vehicle subject to registration or identification under the laws of this state and is one of the following: [¶] . . . [¶] (B) Designed, used, or maintained primarily for the transportation of property. [¶] (2) Has been leased for a term of six months or longer." (Stats. 2003, ch. 729, § 1, italics added.)

The decision interpreting the language of former subdivision (b) with facts most akin to those before us is *Travelers, supra*, 41 Cal.App.4th 1538.

In *Travelers*, a moving and storage company contracted with an independent contractor for moving jobs. The independent contractor was to use his own tractor, and the insured moving company was to provide a suitable trailer for his use. Under the terms of the contract, if the independent contractor provided his own trailer, his commission would increase by 5 percent. At the time of the accident, the trailer being towed was provided by the moving company, but the independent contractor was not driving his own tractor because it was being repaired. Instead, he was driving a tractor that the moving company had itself leased from another company, Westrux International, Inc. (Westrux). "Westrux would not lease a tractor to [the independent contractor] as an individual, so, with [the insured moving company's] consent, the tractor was provided to [the independent contractor] through a general lease agreement between Westrux and [the moving company]." (*Travelers, supra*, 41 Cal.App.4th at p. 1542.)

The *Travelers* court observed that in order for an insurer to receive the benefit of former subdivision (b)'s conclusive presumption, "its insured must be 'engaged in the business of renting or leasing motor vehicles without operators' *and* the involved motor vehicle must be either a commercial vehicle or one leased for at least six months. Both elements must be present in order for [former] section 11580.9, subdivision (b) to apply." (*Travelers, supra,* 41 Cal.App.4th at p. 1545, fn. omitted.) In *Travelers,* as here, it was undisputed that the trailer involved in the accident qualified as a "commercial vehicle," thereby satisfying the second prong of the test. (*Ibid.*)

The *Travelers* court went on to reason that "In order for an insured to be 'engaged in the business of renting or leasing motor vehicles,' renting or leasing activities *must be a regular part of the insured's business. . . .* However, limits on the scope of the phrase 'engaged in the business' can be identified. Neither a single lease of a motor vehicle, nor the occasional leasing of motor vehicles incidental to a different business is sufficient. [Citations.] Were this not the case, [former] section 11580.9, subdivision (b) would apply to *any* rental of a commercial vehicle, and the 'engaged in the business of renting or leasing motor vehicles without operators' language of the subdivision would be rendered nugatory." (*Travelers, supra,* 41 Cal.App.4th at p. 1546, fn. omitted, first italics added.)

The *Travelers* court concluded that even if the arrangement whereby the moving company provided trailers to its independent contractor subhaulers was a lease, "such leasing activity was merely incidental to [the insured moving company's] primary business of moving and storage, such that [it] was not 'engaged in the business of renting or leasing motor vehicles without operators' as a matter of law. [The moving company] did not rent or lease trailers to the general public. Indeed, the only individuals who could lease trailers from [the moving company] for use on the highway were independent contractor subhaulers with whom [it] had entered into independent contractor agreements. Although [the moving company] may have made a slight profit on the lease of these trailers, such leases were *wholly incidental* to its business of moving and storage. If [the company] had no moving and storage business for a subhauler, no trailer would be leased. The concurrent leasing of a trailer in order to enable an independent contractor to conduct subhauling work for [the company] cannot turn [its] moving and storage business into a commercial vehicle rental operation. Therefore, [former] section 11580.9, subdivision (b) does not apply." (*Travelers, supra,* 41 Cal.App.4th at p. 1547, fn. omitted, italics added; see also *McCall, supra,* 119 Cal.App.3d at p. 998 ["the nature of the insured's business, not the status of the particular vehicle,

determines which insurance policy is primary in a multipolicy situation under Insurance Code section 11580.9"].)

The *Travelers* court's conclusions are in conflict with earlier decisions suggesting that whether the insured was "engaged in the business of renting or leasing motor vehicles without operators" under former subdivision (b) should be determined on a case-by-case basis, by looking to the particular factual circumstances surrounding the lease of the commercial vehicle in question.

For example, in *Western Carriers Ins. Exchange v. Pacific Ins. Co., supra,* 211 Cal.App.3d 112 (*Western Carriers*), a trucking company used a farming company's trailers during cotton season, and the farming company used a set of the trucking company's tractors during melon season. There was an accident when the trucking company was using its own tractor and the insured farming company's trailers. The court held that even though the transaction was simply a "bargained exchange," and did not involve the payment of money or a written lease, the insured farming company was nonetheless engaged in the business of leasing commercial vehicles within the meaning of the statute and, therefore, its policy was excess. (*Id.* at pp. 117–118.) The court reasoned that the trucking company's use of the insured's trailers during the cotton season was "unquestionably commercial" because the insured farming company had reciprocal use of the trucking company's tractor, and therefore "[t]he commercial realities of the situation are sufficient to support the trial court's invocation of the conclusive presumption of subdivision (b) of section 11580.9." (*Western Carriers*, at p. 118.)

Similarly, in *Mission Ins. Co. v. Hartford Accident & Indemnity Co., supra,* 160 Cal.App.3d 97 (*Mission Ins.*), the insured construction company leased a trailer to a transport company. The trailer was involved in an accident with a motorcycle in which the motorcycle driver was killed. The construction company leased trailers to the transport company several times a year, for a nominal fee that covered "wear and tear" and reflected little profit. (*Id.* at p. 100.) "[T]he purpose for the lease was merely an accommodation to other companies, which would in turn lease trailers to [the construction company] when needed." (*Ibid.*) The practice was apparently common in the industry.

The *Mission Ins.* court concluded the construction company was in the business of leasing the trailers for purposes of the conclusive presumption of former subdivision (b), even though it did so only several times a year and derived little or no profit from it. (*Mission Ins., supra,* 160 Cal.App.3d 97.) The court reasoned, "The fact that the leasing arrangements were only a small

part of [the insured construction company's] business is not determinative. If it can be reasonably stated that the transaction involved was a commercial transaction, then section 11580.9, subdivision (b) will apply. [Citation.] Even if [the insured construction company] does not make a profit on the leasing of its trailers, that is irrelevant. We look to the actual use of the trailers by [the transport company]. [Citation.] [The transport company] intended and did use the trailers for financial gain, i.e., to fulfill a subhaul agreement to transport woodchips. [The transport company's] decision to lease the trailers from [the insured construction company] was based on a profit motive. It therefore cannot be denied that, at least from [the transport company's] perspective, the leasing of the trailers was a commercial transaction. Furthermore, [the insured construction company's] decision to lease the trailers to another trucking firm, albeit only at the cost of maintenance, was also a commercial decision in every sense of the word. This accommodation was insurance in the event [the construction company] was caught short and would need to lease trailers from other firms. [The construction company's] motive was not charitable, but was designed to ensure profitability." (*Mission Ins.*, at pp. 101–102.)

■ We need not, however, resolve the tension between the holding in *Travelers* and the holdings in *Western Carriers* and *Mission Ins.* over the deleted language of former subdivision (b) in order to furnish the Ninth Circuit with sufficient guidance to correctly decide the matter before it.[4] Even under the holding in *Travelers*, the requirements of former subdivision (b) for applying the conclusive presumption were plainly met. In 1999, the year in question, JTI routinely leased 56 of the 80 trailers it owned to independent contractors pursuant to a standard trailer lease agreement. Under the leases, the independent contractors were charged 20 percent of the fee earned on a hauling job for the lease of its trailers. JTI's gross income from trailer rentals to independent contractors during 1999 was nearly $650,000.

Given the facts of this case, JTI's trailer leasing activities were unquestionably "a regular part of [its trucking] business." (*Travelers, supra,* 41 Cal.App.4th at p. 1546.) To the extent the *Travelers* decision suggests a leasing arrangement like the one in the present case, which is a regular and significant part of the insured's business activities, is "merely incidental" (*id.* at p. 1547) to the main business of hauling because the trailer leases are entered into with the hauling subcontractors themselves rather than with "the general public," and generate only a "slight profit" (*ibid.*), we disagree with it, at least where, as in the present case, substantial income is realized from the leasing activity.

---

[4] This court is free to reframe the question asked by the federal court. (See Cal. Rules of Court, rule 8.548(f)(5).)

## Conclusion

Under the conclusive presumption of former subdivision (b), Fidelity's policy of insurance issued to JTI for the semitrailers leased to Justice that were involved in the accident was excess to the John Deere/Sentry policy of insurance issued to Justice naming JTI as an additional insured.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.